# IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE
# IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE         )
                                 )
      v.                     )       Cr.A. No.: 1312011459
                                 )
                                 )
CHRISTOPHER H. BELL,     )
                                 )
      Defendant.        )
                                 )

Patrick Smith, Esquire                         Louis B. Ferrara, Esquire
Office of the Attorney General             Ferrara & Haley
820 N. French Street, 7th Floor          1716 Wawaset Street
Wilmington, DE 19801                    Wilmington, DE 19806
*Attorney for the State of Delaware*      *Attorney for Defendant*

## DECISION AFTER TRIAL

**RENNIE, J.**

On December 19, 2013, Defendant Christopher H. Bell ("Bell") was arrested and charged with Driving Under the Influence of Alcohol, in violation of 21 *Del. C.* § 4177. On November 3, 2014, Bell moved to suppress evidence of his initial traffic stop and subsequent arrest. The Court heard the motion on December 3, 2014 and concluded that the initial stop was supported by reasonable articulable suspicion, and that the arrest was supported by probable cause.

Trial was held on March 16, 2015. At the conclusion of trial, the Court reserved its decision. This is the Court's final decision after trial.

## FACTUAL BACKGROUND

### A. Suppression Hearing

At the suppression hearing on December 3, 2014, the Court heard testimony from three witnesses: Sergeant Walter Newton ("Sergeant Newton") of the Delaware State Police; Corporal Erik Meese ("Corporal Meese") of the Wilmington Police Department, and; Senior Corporal Marc Martinez ("Corporal Martinez") of the Wilmington Police Department.

On the night of December 18, 2013, Sergeant Newton was traveling on Pennsylvania Avenue, heading toward Wilmington, when he saw a white BMW stopped in the left turning lane, facing a solid green traffic signal at the intersection of Greenhill Avenue. Sergeant Newton, who was off-duty, pulled over and approached the BMW. Sergeant Newton identified Bell as the driver of the vehicle, and stated that he saw that Bell was unresponsive and slouched over on his right side. In an attempt to get Bell's attention, Sergeant Newton knocked on Bell's window and announced his presence. Sergeant Newton noticed that the gear selector was in the drive position, so he opened the driver's door to put the car in park. As he reached across Bell to put the car in park, Bell became aroused, clapped his hands and stated, "Okay, I'm good." Bell

2

then drove away with the driver's door open. Sergeant Newton, who was still standing next to the car when Bell pulled off, jumped back.

Corporal Meese, who happened to be traveling on Pennsylvania Avenue at the time, saw the interaction between Sergeant Newton and Bell. Corporal Meese testified that he saw Sergeant Newton approach Bell's car, and within seconds of Sergeant Newton opening the driver's side door of Bell's car, Sergeant Newton jumped back, and Bell sped off. When Corporal Meese arrived at the scene, Sergeant Newton quickly briefed him on what had transpired. Promptly thereafter, Corporal Meese called for backup and began to follow Bell down Pennsylvania Avenue. Bell, without using his turn signal, made a left-hand turn into the semi-circular driveway at the Devon condominium complex, drove through the driveway, turned back onto Pennsylvania Avenue, and made a right-hand turn onto Greenhill Avenue toward Rockford Park. At that point, Corporal Meese activated his emergency equipment and used a sequence of different sounds. Bell, however, did not immediately stop. Corporal Meese noted that while he followed Bell, Bell was driving in his lane and at the speed limit. After reaching the 1400 block of Greenhill Avenue, Bell drove up on the curb, turned back onto the street, and finally stopped the car.

Corporal Meese asked Bell for his license and registration during the initial stop, but Bell did not immediately respond. Instead, he looked at Corporal Meese and repeatedly asked, "Where's my wallet?" Corporal Meese described Bell's words as slurred, and his movements as slow and deliberate. However, Corporal Meese testified that he could not recall whether he smelled an odor of alcohol during this interaction. Eventually, Bell found his wallet, and retrieved his license and registration. After Bell handed his documents to Corporal Meese,

3

Corporal Meese asked Bell for his keys and instructed Bell to sit in the car while they waited for another Wilmington Police officer to respond to the scene and assume the investigation.

Corporal Martinez arrived at the scene and spoke to both Corporal Meese and Sergeant Newton. He then made contact with Bell and detected a strong odor of alcohol. Corporal Martinez also observed that Bell's eyes were glassy and that his speech was slurred. At Corporal Martinez's request, Bell performed three preliminary tests.[1] Corporal Martinez testified that due to Bell's performance on these tests[2] and Corporal Martinez's own observations, he asked Bell to submit to field sobriety tests. Corporal Martinez administered the horizontal gaze nystagmus (HGN) test,[3] the walk-and-turn test,[4] and the one-leg stand test,[5] all of which, according to Corporal Martinez, Bell performed poorly.[6]

---

[1] Bell performed the finger dexterity test, the alphabet test, and counted backwards from sixty-eight to fifty-three.

[2] Corporal Martinez testified that Bell did not perform the test according to Corporal Martinez's instructions. Corporal Martinez instructed Bell to count from one to four on each finger, touching his thumb, and starting with the index finger. Bell started with his small finger and did not count out loud. Bell completed the alphabet and counting tests, however, during both tests his speech was unusual, and during the counting test, Bell started counting slowly but then his speech became rapid.

[3] On direct examination, Corporal Martinez testified that he conducted the test in a dark area but also stated that there was a street light in the area. The defense objected to the admissibility of the HGN test into evidence at trial, but the Court allowed Corporal Martinez to continue testifying. Corporal Martinez then testified that, although he and Bell were not directly under the street light, there were a number of police vehicles illuminating the area.

[4] During the walk-and-turn test, Bell missed heel to toe, stepped off of the line, raised his arms, and failed to complete the turn as described during Corporal Martinez's instructions.

[5] During the one-leg stand test, Bell raised his arm more than six inches, put his foot down, and swayed. The defense objected to the admissibility of this test and argued that Corporal Martinez's instructions did not comply with NHSTA standards. On direct examination, Corporal Martinez stated that he instructed Bell to raise his foot six inches off the ground and count "one one-thousand, two one-thousand. . . up to thirty", however, on cross examination, Corporal Martinez testified that he instructed Bell to "keep counting until I tell you to stop, that's it."

[6] Corporal Martinez also administered a portable breathalyzer test (PBT), however, the defense objected to its admissibility. The Court found that, because Corporal Martinez could not have properly observed Bell for the required fifteen-minute observation period, the PBT was inadmissible.

4

The Court ultimately determined that Corporal Martinez did have probable cause to arrest Bell for DUI, and denied Bell's motion to suppress. However, the Court noted that even though it was admitting all of the NHTSA field tests into evidence, it would ascribe less weight to the one-leg stand test and the HGN test due to the issues raised with the instructions and lighting, respectively.

## B. Trial

At trial, Corporal Martinez was the sole witness to testify for the State. Corporal Martinez testified that, after Bell performed poorly on the field sobriety tests, he transported Bell to the police station and administered an intoxilyzer test. When the State sought to introduce evidence of the intoxilyzer machine's calibration, Bell objected. During *voir dire* examination, Bell raised two concerns regarding the results of the intoxilyzer test. First, Bell objected to Corporal Martinez's qualification in administering the intoxilyzer test, and argued that Corporal Martinez's certification did not indicate that he was qualified to administer an intoxilyzer test. Second, Bell raised concerns as to whether there was a problem with the intoxilyzer machine itself, due to the fact that the State Chemist Cynthia McCarthy calibrated the machine at the Delaware State Police Crime Lab. The Court allowed Corporal Martinez to continue testifying, but reserved its decision as to whether the State had presented sufficient foundational evidence of Corporal Martinez's qualifications to administer the intoxilyzer test.[7]

Before administering the intoxilyzer test, Corporal Martinez observed Bell for a twenty-minute period, which began at 12:05 a.m. When the State sought to introduce evidence of the intoxilyzer card, Bell objected. During *voir dire* examination, Bell established that Corporal

---

[7] The Court instructed the State to provide documentation regarding any repairs or issues that the intoxilyzer machine may have had during the time in question.

Martinez administered two intoxilyzer tests. He initiated the first intoxilyzer test at 12:29 a.m., however the amount of air that Bell blew into the machine was insufficient to determine his blood alcohol content (BAC). As a result, Corporal Martinez changed the mouthpiece, and initiated a second intoxilyzer test at 12:34 a.m. Bell objected to the introduction of the intoxilyzer reading, and argued that the insertion of the second mouthpiece required Corporal Martinez to observe Bell for an additional, uninterrupted twenty-minute period. The Court admitted the intoxilyzer reading into evidence, but reserved its decision[8] on whether it would consider the reading based upon Bell's arguments.[9]

## DISCUSSION

### A. The Intoxilyzer Test

In addressing Bell's objections to the intoxilyzer test, the Court first considers whether Corporal Martinez was qualified to administer the intoxilyzer test. The State maintains that Corporal Martinez's 2008 Certificate of Training, which stated that he successfully completed the Standardized Field Sobriety Testing Course, qualifies him to administer intoxilyzer tests. Bell argues that Corporal Martinez's testimony regarding the intoxilyzer test is precluded absent any specific documentation indicating that he was trained to administer intoxilyzer tests.

---

[8] Counsel for the State and counsel for the defendant both agreed to this reservation.

[9] After trial, the State filed a letter with the Court, relating to the alleged problems with the intoxilyzer machine. In that letter, the State verified that, after speaking with State Chemist Cynthia McCarthy, there was no additional documentation with respect to the intoxilyzer machine at issue, and maintained that, "[w]hen there is an operational issue with an Intoxilyzer, it is documented on a separate form at the time of the calibration check and stapled to the certification sheet with all the other tests." In response to the State's letter, Bell argued that the State went beyond the limited directive of the Court and thus, requested the Court to schedule a time to have Ms. McCarthy available for cross-examination. Bell also requested that the State produce the master logbook for the machine used in this case, as well as all of the calibration documents for "December 11, 2013" for every New Castle County machine. The Court informed the parties that it would address Bell's issues concerning the State's letter in this opinion.

6

In resolving this issue, the Court has looked to what is required when considering testimony of other scientific tests in the DUI context, specifically the PBT and HGN test. Delaware courts have held "that before admitting PBT results, the State must lay a proper foundation, by establishing that the police officer properly calibrated the PBT machine, and that the officer had been trained to operate the test."[10] Further, Delaware courts have found that the HGN test is a scientific test based on scientific theory.[11] Thus, in order for the Court to consider evidence of the HGN test, the State must provide a proper foundation and present evidence that the officer who conducted the test received specialized training to administer the test and followed the standards in accordance with his training.[12] The Delaware Supreme Court has held that an intoxilyzer test is a scientifically acceptable method of measuring BAC.[13] Therefore, it follows that the State would have to present foundational evidence that the officer received specialized training to administer the intoxilyzer test and followed the standards in accordance with his training.

After reviewing Corporal Martinez's testimony, the Court finds that the State has not produced sufficient evidence of Corporal Martinez's training to administer the intoxilyzer test. At the suppression hearing, Corporal Martinez testified that he received DUI training and was certified by the City of Wilmington in 2003 for administration of field sobriety tests, and

---

[10] *Miller v. State*, 4 A.3d 371, 374 (Del. 2010).

[11] *Zimmerman v. State*, 693 A.2d 311, 314 (Del. 1997), *as revised* (Apr. 10, 1997); *State v. Ruthardt*, 680 A.2d 349, 356 (Del. Super. 1996).

[12] *Zimmerman*, 693 A.2d at 315.

[13] *Clawson v. State*, 867 A.2d 187, 192 (Del. 2005).

maintained that certification in 2008.[14] At trial, during Bell's *voir dire* examination, Corporal Martinez admitted that his certifications did not refer to the Intoxilyzer 5000, however he maintained that "the course encompasses the process of [the] intoxilyzer." Corporal Martinez also described the process that he undertook in administering the intoxilyzer test. Corporal Martinez however, did not clearly articulate that he administered the intoxilyzer test in accordance with his training, nor did he clearly articulate how he was trained. As the State's expert tasked with assisting the trier of fact, Corporal Martinez needed to establish that he has specialized training to administer the scientific test. The State has failed to make such a showing.

In this finding, the Court relies on precedent where Delaware courts have considered specific evidence of an officer's training when admitting evidence of intoxilyzer results under DRE 803(6).[15] Such evidence includes testimony of the officer completing a specific number of hours of police training in using a specific intoxilyzer machine,[16] being trained to use the intoxilyzer by the State Chemist,[17] and receiving a certification for NHTSA and DUI Detection.[18]

---

[14] Specifically, the State's Exhibit 1 is titled "Certificate of Training" and states, "Marc A. Martinez Wilmington Police Department has successfully completed the DUI Detection and Standardized Field Sobriety Testing Course."

[15] *State v. McCoy*, 2012 WL 1415698, at *5 (Del. Super. Feb. 21, 2012); *Saturno v. State*, Cr.A.No. 0905016263 FSS (Del. Super. Aug. 25, 2011); *State v. Vickers*, 2010 WL 2299001, at *3 (Del. Com. Pl. June 9, 2010); *State v. Boyer*, 2006 WL 2666207, at *5 (Del. Com. Pl. Sept. 18, 2006).

[16] *See McCoy*, 2012 WL 1415698, at *5( "[The police officer] successfully completed 16 credit hours of police training in the Intoxilyzer 5000").

[17] *See Boyer*, 2006 WL 2666207, at *5 ("[T]he Corporal established that he completed Intoxilyzer training, conducted by State Chemist Sockrider.").

[18] *See Vickers*, 2010 WL 2299001, at *3 ("[The Corporal] testified that he is a four-year veteran of the Delaware State Police, and completed a forty-hour Intoxilyzer training course conducted by former State

8

Although there is no specific number of requirements that must be articulated to establish sufficient training to administer the intoxilyzer machine, Corporal Martinez's testimony lacked any details regarding his training to operate an intoxilyzer machine and conduct the intoxilyzer test. Indeed, he merely stated that the course that he took incorporated "the process of [the] intoxilyzer," but he did not testify to having completed a specific number of hours of training on a specific intoxilyzer machine, nor did he testify to having been trained by the State Chemist or having received any certifications for NHTSA and DUI safety detection.[19] The Court is not ruling that a statement of training emblazoned on a certificate is a requirement for an officer to testify about the intoxilyzer test. However, as a proffered expert on the administration of the intoxilyzer test, Corporal Martinez needed to provide more than his mere statement that his training included the "process on [the] intoxilyzer." As a result, the Court finds that the State has not produced sufficient evidence of Corporal Martinez's training and qualification to administer the intoxilyzer test. Accordingly, the Court will not consider the intoxilyzer results, and need not reach the other issues raised by Bell regarding the intoxilyzer results.

## B. The DUI Offense

Under 11 *Del. C.* § 4177(a)(1), "[n]o person shall drive a vehicle . . . when the person is under the influence of alcohol." Section 4177(c)(11) defines "while under the influence" to mean "that the person is, because of alcohol . . . , less able than the person would ordinarily have been, either mentally or physically, to exercise clear judgment, sufficient physical control, or due

---

Forensic Chemist Sockrider at the Delaware State Police Academy in 2005, and upon completion of that course, received certification for [NHTSA]-DUI Detection and [HGN] testing.").

[19] By this ruling, the Court is not finding that Corporal Martinez is unqualified to operate the intoxilyzer machine or administer the test but instead that at this trial, the State failed to present sufficient evidence to establish his training and qualification.

care in the driving of a vehicle."[20] In order for a defendant to be found guilty under § 4177, the State must prove, beyond a reasonable doubt, that the defendant was driving, and that he was under the influence of alcohol while he was driving.[21]

In this case, there is no dispute that Bell was driving the vehicle. Sergeant Newton and Corporal Meese both identified Bell as the driver of the BMW, and witnessed Bell driving. Bell however, has challenged whether the State has met its burden of establishing that Bell was under the influence of alcohol while driving.

Corporal Martinez was the State's sole witness to definitively testify to any influence that alcohol had on Bell. Sergeant Newton testified that Bell's state of unresponsiveness, coupled with the fact that the vehicle was in drive, culminated to the possibility that Bell was under the influence. However, Sergeant Newton also testified that, in his report, he made no mention of alcohol, impairment, or his suspicion of impairment. Instead, Sergeant Newton only indicated that Bell "may have been sleeping." Corporal Meese testified that Bell's words were slurred, that his movements were slow and deliberate, and that his motor skills seemed to be impaired however, Corporal Meese did not offer any testimony that attributed Bell's conduct to the influence of alcohol. On the other hand, Corporal Martinez, the officer who conducted the field tests, testified that based on Bell's performance on the field tests, he believed Bell was under the influence of alcohol. Corporal Martinez also testified that, upon his initial contact with Bell, he detected a strong odor of alcohol. The Court finds it curious that Corporal Martinez detected a strong odor when engaging with Bell when Corporal Meese made no mention of any odor of alcohol in his report, and stated that he did not remember if he smelled an odor of alcohol.

---

[20] Del. Code. Ann. tit. 21, § 4177(c)(11).

[21] *Lewis v. State*, 626 A.2d 1350, 1355 (Del. 1993).

10

This concern draws attention to a number of discrepancies in Corporal Martinez's testimony. The Court first notes the discrepancies between Corporal Martinez's testimony and that of the other officers. There were two major discrepancies in Corporal Martinez's testimony that pertain to the lighting of the area in which Corporal Martinez conducted the field tests. These discrepancies are significant because NHTSA requires officers to administer HGN tests in a well-lit area.[22] First, there was a discrepancy as to whether the area was well-lit. Corporal Martinez initially testified that there was a street light in the area, but that he and Bell were not directly under the street lamp, and that it was dark. Only after defense counsel objected did Corporal Martinez state that the officers' vehicles were illuminating the area. Second, there was a discrepancy as to whether the police officers' emergency equipment was activated during the HGN testing. Corporal Martinez testified that at his request, Corporal Meese and Sergeant Newton turned off their emergency equipment while he conducted the field tests. To the contrary, Corporal Meese and Sergeant Newton both testified at trial that their emergency equipment was activated during the testing. Specifically, Sergeant Newton testified that he remained at the scene for approximately five minutes after Corporal Meese stopped Bell, and that his lights were on until he left. Corporal Meese testified that he remained at the scene until Corporal Martinez transported Bell to the police station. Corporal Meese did not remember turning his lights off, nor did he believe that anyone had asked him to turn them off.

There were also discrepancies in Corporal Martinez's testimony regarding how he obtained Bell's license and registration. Corporal Meese testified that he handed Bell's documents to Corporal Martinez upon his arrival. However, Corporal Martinez testified that

---

[22] *State v. Ruthardt*, 680 A.2d 349, 353 (Del. Super. 1996)(citing NHTSA, DOT–HS–806–512, *Improved Sobriety Testing* (1984) (*reprinted in* 2 Donald H. Nichols, *Drinking/Driving Litigation*, ch. 26, app. A (1985)) ("*NHTSA Training Manual* ")).

11

Bell provided him the documents upon his initial contact with Bell. When confronted with this discrepancy on cross examination, Corporal Martinez paused and testified that he did not recall how he obtained the documents.

In addition, Corporal Martinez's testimony contained discrepancies concerning the instructions that he gave Bell when administering the one-leg stand test. On direct examination, Corporal Martinez stated that he instructed Bell to raise his foot six inches above the ground and count "one, one-thousand; two, one-thousand; up to thirty." On cross examination however, Corporal Martinez stated that he told Bell to count until he said to stop. Specifically, Corporal Martinez testified, "My instructions are to keep counting until I tell you to stop, that's it."

These discrepancies raise serious concerns for the Court. In a non-jury trial, the Court sits as the trier of fact and must consider the credibility of each witness, and assign the weight and value of each witness's testimony.[23] When there are discrepancies in a witness's testimony, it is "entirely within the [factfinder's] purview to credit part of [the] testimony while rejecting other parts."[24] The discrepancies present in Corporal Martinez's testimony are significant enough that the Court will disregard his testimony and all evidence introduced by the State through him.

## C. Impairment Theory

With the exclusion of Corporal Martinez's testimony, the Court must determine whether the remaining evidence is sufficient to find Bell guilty of DUI under an impairment theory. Under Delaware law, without proof of chemical testing, impairment may be established by circumstantial evidence of alcohol's influence on a defendant's conduct, demeanor, and

---

[23] *State v. Russell*, 2007 WL 5006533 at *1 (Del. Com. Pl. Dec. 3, 2007); *State v. Westfall*, 2008 WL 2855030 at *2 (Del. Com. Pl. Apr. 22, 2008) (citing *Barks v. Herzberg*, 206 A.2d 507, 708 (Del. 1965)).

[24] *Clark v. State*, 103 A.3d 514 at *4 (Del. 2014) (TABLE).

12

statements.[25] The State, however, still needs to meet its burden to prove impairment beyond a reasonable doubt.[26] "Reasonable doubt does not mean a vague, speculative doubt, nor a mere possible doubt, but a substantial doubt; it is such a doubt as intelligent, reasonable and impartial men may honestly entertain after a careful and conscientious consideration of the evidence in the case."[27] In order for the State to meet its burden, "the facts established by such evidence must be such as to exclude any other reasonable conclusion."[28]

As stated above, Corporal Martinez was the State's sole witness to definitively testify to any influence that alcohol had on Bell. Because the Court has disregarded Corporal Martinez's testimony, the remaining evidence in the record shows that while Bell's car was engaged in drive, he was stopped at a traffic light, and was unresponsive. In fact, Sergeant Newton testified that Bell "may have been sleeping." Bell then drove away while Sergeant Newton was standing next to his car, with the driver's door open. While driving down Greenhill Avenue, Bell failed to immediately stop in response to Corporal Meese's lights and sirens. While driving, he maintained the speed limit, and stayed in his lane. However, he drove on a curb as he came to a stop. In addition, Corporal Meese testified that when he interacted with Bell, Bell's speech was slurred, and his movements were slow and deliberate.

Bell's actions, while imprudent and possibly reckless, without more, does not satisfy the State's burden of establishing beyond a reasonable doubt that Bell was driving while impaired. Because the Court was forced to disregard Corporal Martinez's testimony, the case is now devoid of the typical indicators of impairment such as glassy eyes, strong odor of alcohol, and

---

[25] *Church v. State*, 11 A.3d 226 at *2 (Del. 2010) (TABLE).

[26] *State v. Smith*, 2011 WL 6935626 at *5 (Del. Com. Pl. Dec. 29, 2011).

[27] *State v. Matushefske*, 59 Del. 163, 171-72 (Del. Super. 1965).

[28] *Smith*, 2011 WL 6935626 at *5.

13

rapid speech. Moreover, neither Corporal Meese nor Sergeant Newton directly attribute his behavior to alcohol nor was there any admission by Bell of drinking alcohol. Thus, without testimony of the effect that alcohol had on Bell's poor and unsafe driving, and a lack of clear evidence that he was under the influence of alcohol, the Court cannot conclude that the State has met its burden in establishing, beyond a reasonable doubt, that Bell was driving while impaired.

## CONCLUSION

The State has failed to meet its burden of proving beyond a reasonable doubt that Defendant was driving under the influence of alcohol, in violation of 11 *Del. C.* § 4177. Thus, the Court finds Defendant Christopher H. Bell **NOT GUILTY**.

**IT IS SO ORDERED THIS 23rd day of April, 2015.**

Sheldon K. Rennie,
Judge

14